UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| VITEC, L.L.C.,<br><br>Individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>SUMITOMO RIKO CO., LTD.; SUMITOMO RIKO AMERICA, INC.; and SUMIRIKO TENNESSEE, INC.,<br>        Defendants. | Case No. 2:18-cv-12711 |

**CLASS ACTION COMPLAINT**

Plaintiff VITEC, L.L.C., individually and on behalf of a proposed class of direct purchasers of Automotive Hoses, brings this class action under the federal antitrust laws for treble damages and alleges as follows.

**NATURE OF THE CASE**

1.  Beginning at least as early as February 1, 2004, the Defendant (see ¶ 14 below) and its co-conspirators—United States and global manufacturers and suppliers of Automotive Hoses—violated the antitrust laws by perpetrating a continuing conspiracy to rig bids and fix, raise, maintain, or stabilize prices of Automotive Hoses sold in the United States and elsewhere at supra-competitive levels. Because of this unlawful conduct, Plaintiff and other Class members paid artificially-inflated prices for Automotive Hoses and have suffered antitrust injury to their business or property.

2.  Plaintiff brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 (the "Sherman Act") and Section 4 of the Clayton Act, 15 U.S.C. § 15 (the "Clayton Act"), and asserts

the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, the investigation made by its attorneys.

## DEFINITIONS

3. "Automotive Hoses" are flexible tubes used to convey liquid and air in automotive vehicles. "Automotive Hoses" include low-pressure rubber hoses used in automobile engine compartments and plastic and resin tubes used in automobile engine compartments and fuel tank modules.

4. The "Class Period" is from at least as early as February 1, 2004 through the date of the filing of this complaint.

## JURISDICTION AND VENUE

5. Plaintiff brings this action to recover treble damages, costs of suit, and reasonable attorneys' fees resulting from Defendant's violations of the Sherman Act, 15 U.S.C. § 1.

6. This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

7. Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and the Defendant resides in, is licensed to do business in, has agents in, is found in, and/or transacts business in this District.

8. The activities of Defendant and its co-conspirators were intended to and did have a substantial effect on, and were within the flow of, the interstate commerce of the United States.

9. This Court has *in personam* jurisdiction over the Defendant because, *inter alia,* the Defendant: (a) transacted business throughout the United States, including in this District, (b) manufactured, sold, shipped, and delivered substantial quantities of Automotive Hoses throughout the United States, including in this District, (c) had substantial contacts with the United States, including in this District, and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this District.

## THE PARTIES

10. Plaintiff VITEC, L.L.C. ("VITEC") is a Michigan limited liability company with its principal place of business in Michigan. VITEC purchased Automotive Hoses directly from one or more of the co-conspirators as alleged in this Complaint during the Class Period.

11. Defendant Sumitomo Riko Co. Ltd. is a Japanese corporation with its principal place of business in Aichi, Japan. Sumitomo Riko Co. Ltd.—directly or through its subsidiaries, which it wholly owned or controlled—manufactured, marketed, or sold Automotive Hoses that were purchased in the United States, including in this District, during the Class Period.

12. Defendant Sumitomo Riko America, Inc. is a Delaware corporation located at 41441 11 Mile Road, Novi, Michigan 48375, in this federal judicial district. Sumitomo Riko America, Inc. is a wholly-owned subsidiary of Sumitomo Riko. Sumitomo Riko America, Inc. manufactured, marketed, or sold Automotive Hoses that were purchased in the United States, including in this District, during the Class Period.

13. SumiRiko Tennessee, Inc. is a Delaware corporation located at 199 Pottertown Road, Midway, Tennessee 37809. SumiRiko Tennessee, Inc. is a wholly-owned subsidiary of

Sumitomo Riko. SumiRiko Tennessee, Inc. manufactured, marketed, or sold Automotive Hoses that were purchased in the United States, including in this District, during the Class Period.

14. Sumitomo Riko Co. Ltd., Sumitomo Riko America, Inc. and SumiRiko Tennessee, Inc. are collectively referred to herein as "Sumitomo Riko" or "Defendant".

15. The acts alleged to have been done by the Defendant were authorized, ordered and performed by its officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendant's business affairs.

**DEFENDANT'S CO-CONSPIRATORS AND AGENTS**

16. Co-conspirator Toyoda Gosei Co., Ltd ("Toyoda Gosei") is a Japanese corporation with its principal place of business also located, like Sumitomo Riko Co. Ltd., in Aichi, Japan. In 2014, Toyoda Gosei was named in an Information filed by the United States Department of Justice charging Toyoda Gosei with participating in a conspiracy to restrain trade, in violation of the Sherman Act, 15 U.S.C. § 1, "to suppress and eliminate competition by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of Certain Automotive Hoses" sold in the United States. *United States v. Toyoda Gosei Co., Ltd.,* Case No. 3:14-cr-00349-JZ (N.D. Ohio Sept. 29, 2014)

17. According to the criminal information containing the charges against Toyoda Gosei, Toyoda Gosei and its co-conspirators:

    a. participated in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to Toyota and certain of its subsidiaries, affiliates, and suppliers in the United States;

4

   b. agreed, during those meetings, conversations, and communications, to allocate the supply of Automotive Hoses sold to Toyota and certain of its subsidiaries, affiliates, and suppliers in the United States;

   c. agreed, during those meetings, conversations, and communications, on bids and price quotations to be submitted to Toyota and certain of its subsidiaries, affiliates, and suppliers in the United States;

   d. exchanged information on bids and price quotations to be submitted to Toyota and certain of its subsidiaries, affiliates, and suppliers in the United States, to effectuate the agreements;

   e. submitted bids and price quotations to Toyota and certain of its subsidiaries, affiliates, and suppliers in the United States in accordance with the agreements;

   f. sold Automotive Hoses to Toyota and certain of its subsidiaries, affiliates, and suppliers in the United States at collusive and noncompetitive prices; and

   g. accepted payment for Automotive Hoses sold to Toyota and certain of its subsidiaries, affiliates, and suppliers in the United States at collusive and noncompetitive prices.

18. Toyoda Gosei pled guilty to the above charge and paid a $26 million fine. *Id.* One of its former officers, Makoto Horie, was sentenced to one year and one day in prison for his role in the conspiracy.

19. A previous case on behalf of a class of direct purchasers alleging the same or similar conspiracy to that alleged herein was filed in this judicial district on January 1, 2016, against Toyoda Gosei and two of its wholly-owned subsidiaries in the United States, Toyoda Gosei North

America Corp., and TG Missouri Corp. *Vitec, L.L.C. v. Toyoda Gosei Co., LTD., et al.,* Case No. 2:16-cv-10001 (E.D. Mich.).

20. Other persons or firms not named as defendants or a co-conspirator have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. The Defendant is jointly and severally liable for the acts of its co-conspirators.

21. Defendant acted as a principal or an agent of or for the other co-conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint.

## INTERSTATE TRADE AND COMMERCE

22. The activities of Defendant and its co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

23. During the Class Period, Defendant manufactured, sold, and shipped substantial quantities of Automotive Hoses in a continuous and uninterrupted flow of interstate and foreign commerce.

## AUTOMOTIVE HOSES

24. Automotive Hoses manufactured, distributed or sold by Defendant and its co-conspirators during the Class Period are not functionally distinguishable from each other in any material respect.

25. Automotive Hoses are installed by motor vehicle original equipment manufacturers ("OEMs") in new motor vehicles as part of the manufacturing process. They are also installed in motor vehicles to replace worn out, defective, or damaged Automotive Hoses.

26. OEMs include the Big Three in Detroit (General Motors, Ford and Chrysler) and non-domestic companies that also operate manufacturing plants in the U.S. For example, during

the Class Period, Nissan manufactured motor vehicles in Mississippi and Tennessee, Toyota in Kentucky, BMW in South Carolina, Honda in Ohio and Alabama, Hyundai and Mercedes-Benz in Alabama, and Kia in Georgia. In addition, other customers, such as Tier 1 manufacturers like Plaintiff, purchase Automotive Hoses directly from Defendant or its co-conspirators.

27. When purchasing Automotive Hoses, OEMs issue Requests for Quotation ("RFQs") to motor vehicle parts suppliers. For automotive OEMs, the bidding process begins approximately three years prior to the start of production of a new model platform. In response, motor vehicle parts suppliers submit quotations or bids and the OEM usually awards the business to the selected motor vehicle part supplier for the anticipated production cycle of the platform, usually four to six years. Japanese OEMs procure parts for U.S.-manufactured motor vehicles both in Japan and the United States.

28. Defendant and its co-conspirators supplied Automotive Hoses to OEMs for installation in motor vehicles manufactured and sold in the United States and elsewhere. Defendant and its co-conspirators manufactured Automotive Hoses (a) in the United States for installation in motor vehicles manufactured and sold in the United States, (b) in Japan and elsewhere for export to the United States and installation in motor vehicles manufactured and sold in the United States, and (c) in Japan for installation in motor vehicles manufactured in Japan for export to and sale in the United States.

29. During the Class Period, Defendant and its co-conspirators sold Automotive Hoses directly to OEMs, suppliers to OEMs, distributors, and other purchasers.

30. During the Class Period, Defendant and its co-conspirators, who in a competitive market would be horizontal competitors, engaged in a conspiracy to rig bids for and to raise, fix,

7

maintain, or stabilize prices of Automotive Hoses. Because of their unlawful conduct, Defendant did not compete, but instead conducted its business insulated from competition.

## THE MARKET FOR AUTOMOTIVE HOSES IS CHARACTERIZED BY CONDITIONS CONDUCIVE TO COLLUSION

31. In addition to the Toyoda Gosei guilty plea, several important economic characteristics of the market for Automotive Hoses render it plausible that there was collusion among Automotive Hoses suppliers.

### *High Barriers to Entry*

32. A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing. New entrants would, in turn, decrease the market power of the co-conspirators and diminish their ability to successfully maintain supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Therefore, high barriers to entry help facilitate a cartel.

33. There are high barriers to entry in the market for Automotive Hoses. Entry requires a company to incur significant start-up capital expenditures. A new entrant into the business would have to incur millions of dollars in costs, including capital expenditures on plants and equipment, as well as transportation, electricity, infrastructure for distribution, and labor. A new entrant would also have to have assured relationships with significant customers in order to justify its substantial investments of capital.

### *Price Inelasticity*

34. When a seller of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic. Inelastic pricing enables a cartel to

profit from raising prices above competitive levels. Otherwise, increased prices would result in declining sales, revenues, and profits.

35. Automotive Hoses are required for vehicles that use them; there are no viable substitute products. Therefore, pricing for Automotive Hoses is highly inelastic.

*Opportunities for Collusion*

36. Defendant attended industry events that created opportunities to conspire. Such industry events provided myriad opportunities to meet, conspire, and share information with Defendant's co-conspirators.

### DEFENDANT'S ANTITRUST CONSPIRACY

37. During the Class Period, Defendant and its co-conspirators conspired to rig bids for, to allocate the supply of, and to raise, fix and maintain prices for Automotive Hoses sold in or into the United States.

38. Defendant and its co-conspirators engaged in anticompetitive conduct in furtherance of the alleged conspiracy, as described below.

39. Defendant and its co-conspirators participated in meetings, conversations, and communications in the United States and Japan to discuss bids and price quotations for Automotive Hoses sold in or into the United States.

40. Defendant and its co-conspirators agreed during those meetings, conversations, and communications to allocate among themselves the supply of Automotive Hoses sold in or into the United States.

41. Defendant and its co-conspirators sold Automotive Hoses to customers in the United States and elsewhere at collusive and non-competitive prices.

42. Defendant and its co-conspirators accepted payments for Automotive Hoses sold in the United States and elsewhere at collusive and non-competitive prices.

43. Defendant and its co-conspirators agreed during meetings, conversations, and communications to coordinate price adjustments requested by motor vehicle manufacturers.

44. Defendant and its co-conspirators submitted bids, price quotations, and price adjustments to motor vehicle manufacturers in the United States and elsewhere in accordance with their conspiratorial agreements.

45. Defendant and its co-conspirators held meetings and conversations to monitor and police their bid-rigging and price-fixing conspiracy.

46. Defendant and its co-conspirators affirmatively undertook measures to conceal their unlawful conduct.

47. Defendant and its co-conspirators accomplished the conspiracy, in part, by rigging bids they made in response to RFQs.

48. The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (1) the OEM issues the RFQ to multiple parts suppliers; (2) the suppliers submit bids; (3) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing; (4) the suppliers submit revised bids; and (5) the OEM selects the winner.

49. Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

50. When OEMs purchase Automotive Hoses directly from the supplier to whom they awarded the contract, the OEMs purchase the Automotive Hoses at the winning price.

51. That winning price is also used when OEM suppliers that were not part of the RFQ process purchase Automotive Hoses directly from the winning bidder for incorporation into products manufactured for and sold to OEMs. Those suppliers and other direct purchasers who directly purchase Automotive Hoses from the winning bidder pay the winning bidder at least the winning price. The OEM price sets the floor for pricing of Automotive Hoses.

52. Defendant's conduct persisted for several years. Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that the conspiracy would have continued undetected.

53. Defendant and its co-conspirators manipulated the RFQ process to accomplish the conspiracy.

54. As part of the conspiracy, Defendant sometimes intentionally submitted losing bids, so that the supplier that had the existing Automotive Hoses contract for a particular car model would win the same contract for the successor model.

55. Defendant and its co-conspirators coordinated their Automotive Hoses pricing. They submitted responses to RFQs that incorporated changes to pricing based on the conspiratorial agreements they made with each other. They exchanged pricing information not just to ensure that the agreed-upon party would win the business, but also to ensure that the losing bidders would appear competitive.

56. Defendant and its co-conspirators communicated, held meetings, and reached conspiratorial agreements in furtherance of their price-fixing conspiracy. These activities included, but were not limited to, the following:

a. Agreeing to unlawfully coordinate pricing for, and allocate sales of, Automotive Hoses. For example, in responding to RFQs, Defendant and its co-conspirators agreed that the incumbent supplier would be the preferred bidder, and that Defendant and its co-conspirators would price their bids accordingly.

b. Discussing and exchanging pricing information about Automotive Hoses RFQs and reaching conspiratorial agreements with respect to RFQs by means of communications on multiple occasions to coordinate responses and exchanges and adjustments of Automotive Hoses pricing before submission to OEMs in the United States and elsewhere.

57. Defendant and its co-conspirators knew and intended that their actions regarding their sales of Automotive Hoses to motor vehicle manufacturers would have a direct impact on prices for Automotive Hoses sold to all direct purchasers in the United States.

58. Defendant and its co-conspirators price-fixing conspiracy involving Automotive Hoses impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of Automotive Hoses.

## CLASS ACTION ALLEGATIONS

59. Plaintiff brings this action on behalf of itself, and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as the representative of a Class defined as follows:

> All direct purchasers of motor vehicle Automotive Hoses in the United States from the Defendant (or its controlled subsidiaries, affiliates, or joint-ventures) between at least as early as February 1, 2004 through the date of the filing of this complaint.

60. Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of Class members is unknown to Plaintiff, it is believed to be in the hundreds. The identity of the members of the Class can be readily determined from information and records Defendant possesses.

61. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendant, *i.e.*, they paid artificially inflated prices for Automotive Hoses because of Defendant's anticompetitive and unlawful conduct.

62. Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

63. Plaintiff is represented by counsel experienced and competent in the prosecution of antitrust class action litigation.

64. Questions of law and fact common to members of the Class predominate over questions that may affect only individual Class members, because Defendant has acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Defendant's anticompetitive and unlawful conduct.

65. There are core questions of law and fact common to the Class, such as:

  a. Whether Defendant conspired to fix, raise, maintain, or stabilize prices of, to allocate, or to rig bids for, Automotive Hoses;

  b. Who else participated in the conspiracy and how long it lasted;

  c. Whether the conspiracy caused Automotive Hoses prices to be higher than they otherwise would have been;

  d. Whether Defendant's conduct caused injury to the business or property of Plaintiff and members of the Class;

  e. Whether Defendant's conduct violated Section 1 of the Sherman Act;

  f. Whether Defendant undertook actions to conceal the conspiracy; and

  g. How to measure the damages suffered by the Class.

66. A class action is superior to the other methods available for the fair and efficient adjudication of this litigation because individual joinder of all Class members is impracticable. Individual litigation presents the potential for inconsistent judgments and would greatly increase the cost and duration of litigation for all parties and for the judicial system. A class action permits more efficient case management and offers the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

### ANTITRUST INJURY SUFFERED BY PLAINTIFF AND THE CLASS

67. Defendant's anticompetitive conduct had the following effects:

   a. price competition has been restrained, suppressed, or eliminated with respect to Automotive Hoses;

   b. the prices of Automotive Hoses have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

   c. purchasers have been deprived of free and open competition in the Automotive Hoses market.

68. Because of the alleged contract, combination, or conspiracy, Plaintiff and Class members paid higher prices for Automotive Hoses than they would have in the absence of the conspiracy, and Plaintiff and Class members sustained injury to their business or property.

### PLAINTIFF'S CLAIMS ARE TIMELY

69. Plaintiff and the other Class members had no knowledge of the anticompetitive conduct alleged herein, or of enough facts to place them on notice of the claims set forth herein, until September 29, 2014, at the earliest, when the DOJ announced that Toyoda Gosei Co. Ltd. would plead guilty to having conspired to fix prices and rig bids in connection with Automotive Hoses sold in the United States.

70. Plaintiff and other Class members did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before that date.

71. No information about the Automotive Hoses conspiracy generally was in the public domain or otherwise available to Plaintiff or the Class prior to September 29, 2014. Until then there was insufficient information to suggest that there was an Automotive Hoses conspiracy. For these reasons, the statute of limitations as to Plaintiff's and the Class's claims did not begin to run until (at the earliest) September 29, 2014.

72. Fraudulent concealment by Defendant also tolled the statute of limitations on the claims asserted by Plaintiff and the Class until at least September 29, 2014. Defendant affirmatively and wrongfully concealed its anticompetitive conduct from Plaintiff and the Class, from at least as early as February 1, 2004 through at least September 29, 2014. During that time, Plaintiff and the Class did not learn or discover the operative facts giving rise to this Complaint.

73. Before at least September 29, 2014, Plaintiff and the Class were unaware of any unlawful conduct in the Automotive Hoses market and did not know before then that that they were paying supra-competitive prices for Automotive Hoses during the Class Period. No information, actual or constructive, was ever made available to Plaintiff or other members of the Class that would have suggested that they were being injured by Defendant's unlawful conduct.

74. The affirmative acts by the Defendant alleged herein were wrongfully concealed and carried out in a manner that precluded detection.

75. By its very nature, Defendant's anti-competitive conspiracy was self-concealing. Because Automotive Hoses are not exempt from antitrust regulation, Plaintiff and the Class reasonably believed that the market for Automotive Hoses was competitive.

76. Defendant represented publicly that its pricing and bidding activities were unilateral, rather than being based on anticompetitive agreements. In making those false representations, Defendant misled Plaintiff and the Class as to the true, collusive, and coordinated nature of its bid-rigging, customer-allocation, and price-fixing activities.

77. Defendant's wrongful conduct was carried out in part through means and methods that were designed to prevent detection, and which for a long time succeeded in preventing detection.

78. Defendant participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

79. During these meetings, conversations, and communications, Defendant agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

80. Defendant likewise agreed to allocate the supply of Automotive Hoses sold to customers in the United States and elsewhere on a model-by-model basis.

81. Defendant also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

82. In accordance with its agreements, Defendant submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

83. Plaintiff and the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendant and its co-conspirators to avoid detection of, and to fraudulently conceal, their conduct.

84. For these reasons, the statute of limitations applicable to Plaintiff's and the Class's claims was tolled and did not begin to run until at least September 29, 2014.

## COUNT I: CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT

85. Plaintiff incorporates by reference the allegations set forth above as if fully set forth here.

86. Defendant entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

87. The acts done by the Defendant as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendant's affairs.

88. Commencing at least as early as February 1, 2004 and continuing until the present, the exact dates being currently unknown to Plaintiff, Defendant entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, or maintain prices for Automotive Hoses, creating anticompetitive effects.

89. Defendant's anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Hoses throughout the United States.

90. Because of the conspiracy alleged herein, the prices charged to Plaintiff and the other members of the Class for Automotive Hoses were unlawfully raised, fixed, maintained, or stabilized in the United States.

91. The conspiracy has had the following effects:

a. prices paid by Plaintiff and the Class for Automotive Hoses were raised to, or fixed, maintained, or stabilized at, non-competitive levels;

  b.  Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Automotive Hoses; and

  c.  competition in the market for Automotive Hoses has been unlawfully restrained, suppressed, or eliminated.

  92.  As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and the Class have been damaged, and will continue to be damaged, by paying supra-competitive prices that they would not have had to pay in the absence of the unlawful conduct of Defendant, as alleged herein.

  93.  The conspiracy alleged is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

  WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, and respectfully requests the following relief:

  A.  That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

  B.  That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendant and its co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

  C.  That Plaintiff and the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a judgment in favor of Plaintiff and the Class be entered against the Defendant in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.  That Defendant, its subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.  That Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.  That Plaintiff and the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.  That Plaintiff and the Class receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated: August 30, 2018

Respectfully submitted,

By: /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
FINK + ASSOCIATES LAW
38500 Woodward Ave; Ste. 350
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com
nfink@finkandassociateslaw.com

Gregory P. Hansel
Randall B. Weill
Jonathan G. Mermin
Michael S. Smith
**PRETI FLAHERTY, BELIVEAU
 & PACHIOS LLP**
One City Center, P.O. Box 9546
Portland, ME 04112
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
jmermin@preti.com
msmith@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
Stephen H. Schwartz
**KOHN SWIFT & GRAF, P.C.**
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com
sschwartz@kohnswift.com

Joseph M. Fischer (P13452)
**CARSON FISCHER, P.L.C.**
4111 Andover Road West – Second Floor
West Bldg
Bloomfield Hills, MI 48302
Telephone: (248) 644-4840
jfisher@carsonfisher.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
**FREED KANNER LONDON & MILLEN
LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
**SPECTOR ROSEMAN & KODROFF,
P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Irwin B. Levin
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ilevin@cohenandmalad.com

*Counsel for Plaintiff Vitec, L.L.C. and the Proposed Class*